## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | |
|---|---|
| THE STATE OF LOUSIANA, By and through its Attorney General, Elizabeth B. Murrill; THE STATE OF KANSAS, By and through its Attorney General, Kris W. Kobach; THE STATE OF OHIO, By and through its Attorney General, Dave Yost; and THE STATE OF WEST VIRGINIA, By and through its Attorney General, John B. McCuskey, *Plaintiffs,* v. UNITED STATES DEPARTMENT OF COMMERCE; GINA M. RAIMONDO, in her official capacity as Secretary of Commerce; BUREAU OF THE CENSUS, an agency within the United States Department of Commerce; and ROBERT L. SANTOS, in his official capacity as Director of the U.S. Census Bureau, *Defendants.* | Civil Action No. _____ |

## COMPLAINT

## INTRODUCTION

The Final 2020 Census Residence Criteria and Residence Situations Rule, 83 Fed. Reg. 5525 (Feb. 8, 2018) ("Residence Rule"), states that foreign nationals living in the United States are counted in the census and allocated to the state where their "usual residence" is located—regardless of whether they are lawfully present in the United States and regardless of whether any visa they may possess is temporary.

After the 2020 Census, Defendants included illegal aliens and aliens holding temporary visas ("nonimmigrant aliens") in the census figures used for determining the apportionment of the House of Representatives and Electoral College votes. Due to this unlawful decision, Plaintiff State Ohio lost one congressional seat and one electoral vote in the reapportionment conducted pursuant to the 2020 Census.[1] That congressional seat and electoral vote were reallocated to a state with a larger illegal alien[2] and nonimmigrant alien population. Plaintiff State West Virginia also lost a congressional seat and electoral vote, similarly reallocated to a state with a larger population of illegal and nonimmigrant aliens.[3] And, if Defendants continue to

_____

[1] *See* Jeffrey S. Passel & D'Vera Cohn, *How removing unauthorized immigrants from census statistics could affect House reapportionment*, PEW RESEARCH CENTER, July 24, 2020, https://www.pewresearch.org/short-reads/2020/07/24/how-removing-unauthorized-immigrants-from-census-statistics-could-affect-house-reapportionment/.

[2] As used herein, "illegal aliens" means persons who are present in the United States by virtue of either illegal entry in violation of federal immigration statutes or who have entered the United States legally but have remained present in the country beyond the period of time permitted by federal law.

[3] *See* U.S. CENSUS BUREAU, 2020 CENSUS APPORTIONMENT RESULTS DELIVERED TO THE PRESIDENT (April 26, 2021), *available at*

include illegal aliens in the apportionment count, each of the other Plaintiff States is likely to lose a congressional seat and an electoral vote in the 2030 reapportionment.[4]

By robbing the people of the Plaintiff States of their rightful share of political representation, while systematically redistributing political power to states with high numbers of illegal aliens and nonimmigrant aliens, the Residence Rule violates § 2 of the Fourteenth Amendment to the United States Constitution and the constitutional principle of equal representation. The Residence Rule also violates Article II, § 1, of the United States Constitution by necessitating an unconstitutional distribution of Electoral College votes among the states.

The Residence Rule also breaches the federal government's constitutional obligation to conduct an "actual Enumeration" of the number of "persons in each State." The phrase "persons in each State" was understood at both the Founding and in the Reconstruction era to be restricted to United States citizens and permanent resident aliens who had been lawfully admitted to the body politic constituted by the Constitution. Aliens who are unlawfully or temporarily present in the United States did not qualify because they are not entitled to political representation. It has long been understood that foreign diplomats temporarily in

---

https://www.census.gov/newsroom/press-releases/2021/2020-census-apportionment-results.html#:~:text=Texas%20will%20gain%20two%20seats,states'%20number%20of%20seats%20will.

[4] *See* Steven A. Camarota & Karen Zeigler, *Tilting the Balance: Estimating the impact of legal and illegal immigration on apportionment and political influence in the U.S. House and Electoral College*, Oct. 31, 2024, https://cis.org/Report/Tilting-Balance.

the U.S. also did not qualify. U.S. Const. art. 1, § 2, cl. 3. But, in any case, the Fourteenth Amendment separately requires that illegal aliens who have been denied the right to vote be excluded from state apportionments. Thus, the actual enumeration of the population of the states cannot include such aliens. Only U.S. citizens and lawful permanent residents ("LPRs," also known as "green card holders") can be included.

## THE PARTIES

1.  Plaintiff State of Kansas is a sovereign State of the United States of America. It sues to vindicate its sovereign, quasi-sovereign, and proprietary interests. Kansas brings this suit through its attorney general, Kris W. Kobach. He is the chief legal officer of the State of Kansas and has the authority to represent Kansas in federal court. Kan. Stat. Ann. 75-702(a).

2.  Plaintiff Louisiana is a sovereign State of the United States of America. Louisiana sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests. Louisiana brings this suit through its attorney general, Liz Murrill. She is the chief legal officer of the State of Louisiana and has authority to institute any civil action. LA Const. Art. IV, § 8.

3.  Plaintiff the State of Ohio is a sovereign State of the United States of America.  Dave Yost, the Attorney General of Ohio, is authorized to sue on behalf of Ohio. *See* Ohio Rev. Code §109.02; Ohio Constitution, Art. III, §1.

4.   Plaintiff State of West Virginia is a sovereign State of the United States of America. J.B. McCuskey is the Attorney General of the State of West Virginia. The

4

Attorney General of West Virginia "is the State's chief legal officer," *State ex rel.*
*McGraw v. Burton*, 569 S.E.2d 99, 107 (W. Va. 2002), and his express statutory
duties include "appear[ing] as counsel for the state in all causes pending . . . in any
federal court[] in which the state is interested," W. Va. Code § 5-3-2.

5.   Defendant United States Department of Commerce is a cabinet agency
within the executive branch of the United States Government, and is an agency
within the meaning of 5 U.S.C. § 552(f).

6.   The Commerce Department is responsible for planning, designing, and
implementing the 2020 Census. 13 U.S.C. § 4.

7.   Defendant Gina M. Raimondo is the Secretary of Commerce. She is
responsible for conducting decennial censuses of the population, and oversees the
Bureau of the Census ("Census Bureau"). Secretary Raimondo is sued in her official
capacity.

8.   Defendant Census Bureau is an agency within, and under the jurisdiction of,
the Department of Commerce. 13 U.S.C. § 2. The Census Bureau is the agency
responsible for planning and administering the decennial census.

9.   Defendant Robert L. Santos is the Director of the Census Bureau. He is sued
in his official capacity.

**JURISDICTION AND VENUE**

10. The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and
2201(a) because this action arises under U.S. Constitution, amend. XIV, § 2, U.S.
Constitution, art. I, § 2, and U.S. Constitution, Art. II, § 1.

11. This Court also has jurisdiction under 28 U.S.C. § 1346(a) because this is a civil action against the United States.

12. Declaratory relief is sought as authorized under 28 U.S.C. § 2201.

13. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. Plaintiff Louisiana is a resident of this judicial district and no real property is involved in this action.

## BACKGROUND

### I.  Defendants have a constitutional obligation to conduct the Census so as to ensure fair representation of the States.

14. The Census Clause of the United States Constitution provides that Representatives "shall be apportioned among the several States . . . according to their respective Numbers," U.S. Const. art. I, § 2, cl. 3, which requires "counting the whole number of persons in each State." *Id.* amend. XIV, § 2.

15. To ensure fair representation among the states, the Constitution requires that this count of the population of each state consist in an "actual Enumeration" of the number of "persons" in each state conducted every ten years "in such manner as [Congress] shall by law direct." *Id.* art. I, § 2, cl. 3.

16. The same enumeration determines the number of each state's electors in the Electoral College. The Constitution provides that each state is entitled to "a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled to in Congress." U.S. Const. art. II, § 1, cl. 2. The Census enumeration therefore determines the number of Presidential electors to

which each state is entitled by determining the size of each state's congressional delegation.

17.  Under the statute governing the conduct of the census, the Secretary of Commerce "shall, in the year 1980 and every 10 years thereafter, take a decennial census of population as of the first day of April of such year." 13 U.S.C. § 141(a). The statute further provides that "[t]he tabulation of total population by States . . . as required for the apportionment of Representatives in Congress among the several States shall be completed within 9 months after the census date and reported by the Secretary to the President of the United States." *Id.* § 141(b).

18.  The Secretary is authorized to delegate authority to establish procedures to conduct the census to the Census Bureau. 13 U.S.C. §§ 2, 4.

19.  To produce an accurate count, the Census Bureau sends a questionnaire to every household in the United States; anyone over the age of 18 who is requested to respond is legally required to respond. 13 U.S.C. § 221. This is one of the primary, but not the only, means by which the Census Bureau determines the population of each state.

20.  Once the decennial census is conducted by the Census Bureau, the Secretary of Commerce reports the population of the states to the President. The President must then

> "transmit to the Congress a statement showing the whole number of persons in each State excluding Indians not taxed, as ascertained under the seventeenth and each subsequent decennial census of the population, and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives."

2 U.S.C. § 2a(a).

21. Congressional seats are allocated under 2 U.S.C. § 2a(b):

[e]ach State shall be entitled, in the Eighty-third Congress and in each Congress thereafter until the taking effect of a reapportionment under this section or subsequent statute, to the number of Representatives shown in the [aforementioned statement from the President], no State to receive less than one Member.

## II. The Residence Rule unlawfully requires including illegal aliens and nonimmigrant aliens in the apportionment base used for assigning seats in the House of Representatives and the Electoral College.

22. The apportionment population of a state includes a state's "resident population" plus "a count of overseas federal employees." 83 Fed. Reg. at 5526, fn. 1.

23. The resident population of a state includes all persons counted in the Census. Any person qualifies as a state resident if the state is his "usual residence," defined by the Census Bureau as "where they live and sleep most of the time." 83 Fed. Reg. at 5526.

24. Illegal aliens are counted if they complete and return their Census form or if their presence in the United States is recorded in a Census Bureau interview.

25. Nonimmigrant aliens are counted if they complete and return their Census form or if their presence in the United States is recorded in a Census Bureau interview.

26. The Census does not ask about lawful presence in the U.S., citizenship status, or LPR status.

27. Under the Residence Rule, "[c]itizens of foreign countries living in the United States" are "[c]ounted at the U.S. residence where they live and sleep most of the time." 83 Fed. Reg. at 5533.

28. Citizens of foreign countries are counted in the census tally used for apportionment purposes regardless of their immigration status or lack thereof.

29. The Secretary of Commerce uses the Census Bureau's estimates of the total number of persons in each state to prepare for the President a "tabulation of total population by States . . . as required for the apportionment of Representatives in Congress among the several States." 13 U.S.C. § 141(b). Under the Residence Rule, the tabulation includes the illegal alien and nonimmigrant alien population of each state.

30. The President must rely on the estimates delivered by the Secretary to determine the number of congressional seats to which each state is entitled. The President has no authority to base an apportionment on any alternative tally of the population of each state.

31. The Clerk of the House of Representatives is bound by law to issue a statement to the executives of each state reflecting the President's determination of the number of seats in the House of Representatives to which each state is entitled. 2 U.S.C. § 2a(b). Thus, the final act required by statute to complete the apportionment process will be based on an enumeration of the population of each state that includes illegal aliens and nonimmigrant aliens.

32. Accordingly, the Residence Rule's criteria for determining the population of each state determines the apportionment of the House of Representatives and the Electoral College.

**III. Including illegal aliens and nonimmigrant aliens in the apportionment base has redistributed congressional seats and electoral votes from states with low numbers of such aliens to states with high numbers.**

33. For the past three decades, the United States has been undergoing the largest wave of immigration in American history.

34. At the end of the 1990s, about 1.5 million immigrants, both legal and illegal, began arriving in the United States each year. And that rate has remained stable since then. In 2016, the Department of Homeland Security (DHS) determined that an estimated 1.1 million persons were granted legal permanent resident status in the United States, up from 1 million in 2015 and 2014.[5] By contrast, immigration to the United States in the Ellis Island migration wave peaked at about 800,000 persons per year between 1900 and 1909.[6] The Ellis Island wave had been, until today, the largest migration in United States history.

35. Many aliens are not lawfully present. DHS estimates that 11.57 million illegal aliens resided in the United States in 2018, and that 10.99 million lived in

---

[5] U.S. DEPARTMENT OF HOMELAND SECURITY, PERSONS OBTAINING LAWFUL PERMANENT RESIDENT STATUS: FISCAL YEARS 1820 TO 2016 (Dec. 2017), *available at* https://www.dhs.gov/immigration-statistics/yearbook/2016/table1
[6] George J. Borjas, *We Wanted Workers: Unraveling the Immigration Narrative* 52 (2016).

the United States in 2022.[7] Other estimates substantially confirm these numbers.

Pew Research Center estimated 11 million illegal immigrants in the U.S., and noted

their estimates probably understate the number of illegal aliens in the U.S. since

they do not account for the record levels of illegal immigration in 2022-2023.[8] When

the surge of 2022-2023 is taken into account, according to the Center for Migration

Studies, the illegal alien population is estimated to be at least 11.7 million.[9]

36. According to the Pew Research Center, the population of nonimmigrant

aliens in the U.S. is approximately 2 million.[10] The most recent data from DHS

showed 3.2 million nonimmigrant aliens residing in the U.S. in 2019.[11]

---

[7] Bryan Baker & Robert Warren, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2018-January 2022*, DHS Office of Homeland Security Statistics (April 2024), *available at* https://ohss.dhs.gov/sites/default/files/2024-06/2024_0418_ohss_estimates-of-the-unauthorized-immigrant-population-residing-in-the-united-states-january-2018%25E2%2580%2593january-2022.pdf

[8] Jeffrey S. Passel & Jens Manuel Krogstad, *What we know about unauthorized immigrants living in the U.S.,* PEW RESEARCH CENTER (July 22, 2024), https://www.pewresearch.org/short-reads/2024/07/22/what-we-know-about-unauthorized-immigrants-living-in-the-us/.

[9] Robert Warren, *US Undocumented Population Increased to 11.7 Million in July 2023: Provisional CMS Estimates Derived from CPS Data*, CENTER FOR MIGRATION STUDIES (Sept. 5, 2024), available at https://cmsny.org/us-undocumented-population-increased-in-july-2023-warren-090624/#:~:text=The%20total%20undocumented%20population%20increased,to%2010%10million%20in%202020.

[10] Mohamad Moslimani & Jeffrey S. Passel, *What the data says about immigrant in the U.S.*, PEW RESEARCH CENTER (Sept. 27, 2024), https://www.pewresearch.org/short-reads/2024/09/27/key-findings-about-us-immigrants/.

[11] *See* Bryan Baker, *Population Estimates of Nonimmigrants Residing in the United States: Fiscal Years 2017-2019* at 4, DHS OFFICE OF HOMELAND SECURITY STATISTICS (May 2021)*,* https://ohss.dhs.gov/sites/default/files/2023-12/ni_population_estimates_fiscal_years_2017_-_2019v2.pdf.

37. Since 1910, there have been 435 voting members of the House of Representatives. The reapportionment of House seats and electoral votes is therefore zero-sum: one state's gain is another state's loss.

38. Illegal immigration affects the distribution of seats in the House of Representatives and the Electoral College because the illegal alien population is both large and highly concentrated in a minority of states.

39. In 2022, according to the Pew Research Center, 56% of the nation's 11.7 million illegal aliens lived in just six states: California, Texas, Florida, New York, New Jersey, and Illinois.[12]  DHS estimates showed a similar 59% of all illegal aliens living in the top six states, and 72% in just ten states.[13]

40. Defendants' practice of including illegal aliens in the Census has repeatedly distributed additional House seats and electoral votes to states with high numbers of illegal aliens from states with low numbers, depriving those states and their citizens of their rightful share of representation and political power.

41. In each of the last three censuses, in 2000, 2010, and 2020, counting illegal aliens changed the apportionment of state representatives and electors from what it would have been if illegal aliens were not counted.

42. The presence of illegal aliens in the 2000 Census apportionment base caused Indiana, Michigan, and Mississippi to each lose one seat in the House and one vote in the Electoral College in 2000, while Montana failed to gain a seat in the House

---

[12] Passel & Krogstad, *supra* note 8.
[13] Baker & Warren, *supra* note 7.

and an Electoral College vote it otherwise would have gained.[14] California gained three seats due to the inclusion of illegal aliens in the 2000 Census, and North Carolina gained one seat. *Id.* Thus, four House seats and four Electoral College votes were redistributed by the inclusion of illegal aliens in the apportionment base in the 2000 Census.

43.  In the apportionment that followed the 2010 Census, Louisiana, Missouri, and Ohio each lost one Representative and one electoral vote. And Montana failed to gain a seat and an electoral vote that it would have gained had illegal aliens been excluded from the apportionment base. By contrast, California gained 2 seats and electoral votes that it would not have had if illegal aliens had been excluded from the apportionment base, and Florida and Texas each gained one congressional seat and one electoral vote *Id.*

44.  In the apportionment following the 2020 Census, Ohio, West Virginia, California, Illinois, Michigan, Pennsylvania, and New York lost a Representative and an electoral vote, while Colorado, Florida, North Carolina, Montana, and Oregon each gained one—and Texas gained two.[15]

---

[14] Dudley L. Poston, Jr., Steven A. Camarota, & Amanda K. Baumle, *Remaking the Political Landscape: The Impact of Illegal and Legal Immigration on Congressional Apportionment,* CENTER FOR IMMIGRATION STUDIES (Oct. 2003), https://cis.org/Report/Remaking-Political-Landscape.

[15] Brynn Epstein & Daphne Lofquist, *Congressional Apportionment: 2020 Census Briefs*, U.S. CENSUS BUREAU (May 2023), https://www2.census.gov/library/publications/decennial/2020/census-briefs/c2020br-01.pdf

45. In a state in which a large share of the counted population cannot vote, the votes of citizens have more weight than those of residents of states with a larger share of the population composed of citizens.

46. Counting illegal aliens in the census takes voting power from some Americans and gives it to others. For example, in the states that lost seats due to immigration in 2010, 96 percent of the voting-age population were citizens, in contrast to 86 percent in the states that gained seats.[16] And the average congressional district had 543,243 voting-age citizens, compared to only 449,553 in the states that gained seats. *Id.*

47. The distribution of nonimmigrant aliens resembles the distribution of illegal aliens, and is nearly as concentrated in a small number of states. More than half live in just six states, and two-thirds in just ten states.[17]

48. Including illegal aliens in the apportionment base compromises the right to equal representation. Equal representation, sometimes referred to as "one person, one vote," is the doctrine that Article 1, § 2 of the Constitution requires "as nearly as is practicable [that] one man's vote in a congressional election is to be worth as much as another's." *Wesberry v. Sanders*, 376 U.S. 1, 7-8 (1964). While the principle does not require "mathematical precision," equal representation must be "the fundamental goal" of apportionment. *Id*. at 18.

---

[16] Steven A. Camarota, *Shifting the Balance: How the Gang of Eight bill and Immigration generally shifts seats in the House of Representatives*, CENTER FOR IMMIGRATION STUDIES (Nov. 2013), https://cis.org/sites/default/files/camarota-house-reapportionment.pdf.
[17] *See* Baker, *supra* note 11.

49. The redistribution of political power caused by including illegal immigrants in the apportionment base encourages states with large illegal alien populations to refuse to cooperate with federal immigration authorities (so they maintain and augment their additional representatives and votes in the Electoral College) and punishes states who do cooperate with federal immigration authorities in the identification and removal of aliens who are not lawfully present in the United States.

**IV. Defendants' decision to include illegal aliens and nonimmigrant aliens in the census population count for purposes of apportionment will rob the Plaintiff States and their legal residents of their rightful share of representation.**

50. The effects of illegal immigration on congressional and electoral apportionment can be accurately measured by removing the estimated illegal alien population from each state's projected total population and recalculating the allocation of seats in the House of Representatives using the method of equal proportions. *See* 2 U.S.C. § 2(a) (describing method of apportionment).

51. Kansas has four seats in the House of Representatives and six Electoral College votes.

52. Louisiana has seats six seats in the House of Representatives and eight Electoral College votes.

53. Ohio has fifteen seats in the House of Representatives and seventeen Electoral College votes.

54. West Virginia has two seats in the House of Representatives and four Electoral College votes.

55. Ohio lost a congressional seat (and, consequently, an electoral vote) due to the inclusion of illegal aliens in the 2020 Census. *See* Camarota & Ziegler, *supra*. Ohio also lost a seat and an electoral vote because of the inclusion of illegal aliens in the 2010 Census.

56. As a result of the inclusion of illegal aliens in the 2020 Census, Texas gained one congressional seat and one electoral vote, and California kept a congressional seat and an electoral vote that it would have otherwise lost. *Id*.

57. Counting illegal aliens in the Census deprived Ohio and its legal residents of equal representation in the House of Representatives and the Electoral College because illegal aliens are not entitled to representation in either body.

58. The 2020 census counted the populations of Plaintiff States as follows:[18]

Kansas          2,937,745

Louisiana       4,657,874

Ohio            11,799,453

West Virginia   1,793,736

59. For the Plaintiff States, the Pew Research Center estimated populations of illegal aliens were as follows (in 2021, with the percentage of total population):[19]

---

[18] *Annual Estimates of the Resident Population for the United States, Regions, States, District of Columbia and Puerto Rico: April 1, 2020 to July 1, 2024*, U.S. CENSUS BUREAU, https://www.census.gov/data/tables/time-series/demo/popest/2020s-state-total.html.

[19] Passel & Krogstad, *supra* note 8.

16

| Kansas | 75,000 (2.6%) |
| Louisiana | 70,000 (1.5%) |
| Ohio | 120,000 (1.0%) |
| West Virginia | 5,000 (0.3%) |

60. On the basis of these numbers, each congressional district in the Plaintiff States represents approximately the following number of people (not excluding illegal aliens):

| Kansas | 734,436 |
| Louisiana | 776,312 |
| Ohio | 786,630 |
| West Virginia | 896,868 |

61. On the basis of the Pew Research Center numbers, however, excluding illegal aliens from those state congressional districts would leave the following average populations:

| Kansas | 715,341 |
| Louisiana | 764,668 |
| Ohio | 778,630 |
| West Virginia | 894,177 |

62. But in California, with a 2020 census population of 39,555,674, the state included an estimated 1,850,000 illegal aliens—highest in the nation—or 4.7% of

the total.[20] Each California congressional district therefore contains 760,686 people, but only 728,955 citizens or legal residents.

63. This data supports the proposition that excluding illegal aliens from the apportionment base would reduce representational inequality between the Plaintiff States and the states, like California, with large populations of illegal aliens counted in the census.

## VI. The Residence Rule deprives Plaintiff States of federal funding that is proportioned on the basis of population.

64. Federal funding to states is regularly distributed on the basis of state populations according to decennial census population counts. Census Bureau researchers found 353 programs using Census data to distribute $2.8 trillion in federal funds in 2021.[21] These programs include Medicaid, Medicare and the Children's Health Insurance Program (CHIP), the Supplemental Nutrition Assistance Program (SNAP) and its Women, Infants, and Children supplement (WIC), and Head Start.

65. The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) prohibits illegal aliens, and some nonimmigrant aliens, from

---

[20] *Id.*

[21] Ceci Villa Ross, *Uses of Decennial Census Programs Data in Federal Funds Distribution: Fiscal Year 2021*, U.S. CENSUS BUREAU (June 2023), https://www.census.gov/library/working-papers/2023/dec/census-data-federal-funds.html; s*ee also Glavin v. Clinton*, 1 F.Supp.2d 543, 550 (E.D. Va. 1998) (citing cases endorsing the connection between census data and federal funding).

receiving federal public benefits. 8 U.S.C. § 1611(a).[22] Thus, federal funding for public benefits is not intended for statutorily ineligible aliens.

66. The total illegal alien population is at least 4% of the total state population in 9 states: California, Connecticut, Florida, Maryland, Massachusetts, Nevada, New Jersey, Texas, and Washington.[23]

67. The illegal alien populations in Plaintiff States do not exceed 2.6% (Kansas). Louisiana, Ohio, and West Virginia are each below 1.5%. *See* para. 59.

68. The Residence Rule, by including illegal and nonimmigrant aliens in the Census population tabulations, therefore causes the Plaintiff States to receive a smaller share of federal funding than other states, whose populations contain a higher percentage of illegal and nonimmigrant aliens, than they would if such aliens were not counted.

**VII. The Residence Rule is Unlawful.**

69. The Residence Rule is unlawful because it violates (1) Section 2 of the Fourteenth Amendment; (2) the Census Clause of Article I, § 2; (3) and the Electoral Apportionment Clause of Article II, § 1.

---

[22] PRWORA states: "an alien who is not a qualified alien . . . is not eligible for any Federal public benefit." 8 U.S.C. § 1611(a). Congress defined a "qualified alien" to include only lawful permanent residents, asylees, refugees, parolees granted parole for a period of at least one year, aliens granted withholding of removal under specifically identified subsections of the Immigration and Nationality Act (INA) (generally having to do with restrictions on removal to a country where the alien's life or freedom would be threatened), and certain battered aliens. *Id.* §§ 1641(b), (c).
[23] Ross, *supra* note 21, Tables, *available at* https://www.pewresearch.org/wp-content/uploads/sites/20/2024/07/SR_24.07.22_unauthorized-immigrants_table-3.xlsx.

**A. Including illegal aliens and nonimmigrant aliens in the federal apportionment base violates the Fourteenth Amendment and Article II, § 1.**

70. The Fourteenth Amendment provides that "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each state, excluding Indians not taxed." U.S. Const. amend. XIV, § 2, cl. 1.

71. The relevant language in the Fourteenth Amendment follows the essential language of the original Census Clause, which provided that "Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons." U.S. Const. art. I, § 2, cl. 3.

72. Electoral votes are apportioned in the same way, but with the addition of two votes for each state's Senate representation. Under Article II, § 1, Clause 2, "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress."

73. Any rule governing the conduct of the census and apportionment must be "consistent with the constitutional language and the constitutional goal of equal representation." *Franklin v. Massachusetts*, 505 U.S. 788, 804 (1992).

74. The Residence Rule promulgated by the Census Bureau does not comport with either of those requirements and is thus unconstitutional.

**1. Including illegal aliens and nonimmigrant aliens in the apportionment base is inconsistent with the text of the Fourteenth Amendment because illegal aliens are not "persons in each State" for apportionment purposes.**

75.  Incorporating illegal aliens and nonimmigrant aliens into the apportionment base is inconsistent with the language of the Fourteenth Amendment's Census Clause because the term "persons in each State," as it occurs in the Census Clause of the Fourteenth Amendment, does not refer to every natural person who happen to be present in the United States on census day, but rather only to members of "the people."

76.  The Constitution uses the terms "persons" and "the people" interchangeably. The history and structure of the Constitution indicate that the Fourteenth Amendment Census Clause uses the term "persons" to refer to "members of the people." And "the people" refers to persons who are "members of the political community" constituted by the Constitution and the laws of the United States. *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008). It is highly likely that the term "whole person" (used in the Fourteenth Amendment) was chosen to match the phrase "three-fifths of persons" (used in the Constitution's Census Clause), which it replaced.

77.  Illegal aliens and nonimmigrant aliens are not members of the political community constituted by the Constitution and thus cannot be counted for apportionment purposes. Therefore, the Residence Rule violates the Census Clause of the Fourteenth Amendment because it incorporates illegal aliens in the congressional apportionment base.

78. The Residence Rule caused the apportionment based on the 2020 census to violate the Fourteenth Amendment by including aliens who should not be counted in the apportionment base under this amendment. Counting illegal aliens will have the same effect in the next decennial census in 2030.

79. The Residence Rule violates Article I, § 2, because the "actual Enumeration" required by that provision includes only those citizens and legal permanent residents who should be counted for apportionment purposes. It does not include illegal aliens or nonimmigrant aliens.

80. The Residence Rule violates Article II, § 1, because it mandates a distribution of Electoral College electors among the states based on an unconstitutional allocation of congressional seats.

**2. Including illegal aliens in the apportionment base is inconsistent with the text of the Fourteenth Amendment because illegal aliens and nonimmigrant aliens are not inhabitants of the states.**

81. The Census Clause requires apportionment based on the "number of persons in each State." U.S. Const. amend. XIV, § 2, cl. 1.

82. The original Census Clause apportioned representatives "among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons." U.S. Const. Art. I, § 2, cl. 3.

83. At both the time of the founding and when the 14th Amendment was ratified, the language of the Census Clause was publicly understood to require an apportionment base comprised of the *inhabitants* of the states.

84. The drafts of the apportionment provision, including the version initially approved by the Constitutional Convention, used the term "inhabitants" rather than "persons" or "residents."[24]

85. In the public law of the founding era, the term "inhabitant" did not encompass unlawful or temporary residents because inhabitancy was a legal status that depended upon permission to settle granted by the sovereign nation in which an alien wished to reside.

86. Although the language of the original Census Clause omitted the term "inhabitant," this change was not intended as a substantive alteration of the drafting language. The original public understanding of the Census Clause was that the phrase "whole Number of free Persons" in each state was synonymous with the term "inhabitants," and that term did not encompass unlawful residents.[25] The "Number" of persons in each state was equivalent to that state's number of inhabitants at the Founding.

---

[24] *See* 2 Records of the Federal Convention of 1787, 350 fn. 13 (Max Farrand, ed., Yale University Press, 1937) (showing early draft of Census Clause referred to the "whole number of … free citizens and inhabitants, of every age, sex and condition, including those bound to servitude for a term of years, and three fifths of all other persons not comprehended in the foregoing description (except Indians not paying taxes))."

[25] *See Franklin*, 505 U.S. at 804 (noting that the census of 1790 allocated persons according to their "usual residence," which was understood "broadly enough to include some element of allegiance or enduring tie to a place.").

87. When the Census Clause was given its present form by the Fourteenth Amendment, the phrase "whole number of persons in each State" was publicly understood to refer only to legal, permanent inhabitants of the states and did not purport to alter the meaning of the Census Clause so that unlawful or temporary residents would be included in the apportionment base.

88. The phrase "persons in each State" was understood to mean the same thing as "the whole Number of free Persons" in the original Census Clause.

89. Thus, the Residence Rule violates the Census Clause of the Fourteenth Amendment because it includes illegal aliens and nonimmigrant aliens in the apportionment base even though they do not qualify as "inhabitants" of the states under the original understanding of the Constitution.

90. The Residence Rule is inconsistent with Article I, § 2, because the "actual Enumeration" required by that provision includes only those who constitute "persons in each State" for Fourteenth Amendment purposes. It does not encompass illegal aliens or nonimmigrant aliens.

91. The Residence Rule violates Article II, § 1, of the Constitution because it mandates a distribution of Electoral College votes based on an unconstitutional allocation of congressional seats.

**3. Under the Fourteenth Amendment, section 2, illegal aliens and nonimmigrant aliens cannot be counted in the apportionment base, even if they are considered "inhabitants," because they are denied the right to vote.**

92. Section 2 of the Fourteenth Amendment states:

But when the right to vote at any election for the choice of electors for President and Vice-President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

U.S. Const. amend. XIV, § 2.

93.  Illegal aliens and nonimmigrant aliens are denied the right to vote in federal elections. *See* 18 U.S.C. § 611. Therefore, they cannot be considered "inhabitants," consistent with the meaning of § 2 of the Fourteenth Amendment.

94. If illegal aliens and nonimmigrant aliens are counted as "inhabitants," they must still be excluded from the apportionment in order to comply with § 2 of the Fourteenth Amendment.

95.  Since the Residence Rule counts illegal aliens and nonimmigrant aliens, who are denied the right to vote, along with citizens who are not denied the right to vote, the Rule requires the Census Bureau and the President to violate § 2's requirement that each state's apportionment be reduced by the percentage of the population that consists in illegal aliens and nonimmigrant aliens. The Residence Rule is therefore unconstitutional.

**4. Including illegal aliens and nonimmigrant aliens in the apportionment base is inconsistent with the constitutional requirement of near-equal representation.**

96. Rules governing the conduct of the decennial census and apportionment are constitutional only if they are "consistent with . . . the constitutional goal of equal representation." *Franklin*, 505 U.S. at 804.

97. The "principle of representational equality" embodied in the Constitution requires "that the voters of each district have the power to elect a representative who represents the same number of constituents as all other representatives." *Evenwel v. Abbott*, 136 S.Ct. 1120, 1126 (2016).

98. Illegal aliens and nonimmigrant aliens are not "constituents" for purposes of the principle of equal representation because they have no legal entitlement to representation in the House of Representatives or the Electoral College.

99. Representatives and electors represent only the self-governing people of the United States, their descendants, and aliens whom the people of the United States have chosen to admit to the political community created by the Constitution through lawful immigration by granting them lawful permanent resident status. Illegal aliens and nonimmigrant aliens are not part of this political community and are thus not entitled to political representation.

100. Illegal aliens and nonimmigrant aliens are not "constituents" in the sense comprehended by the principle of equal representation because they have not been admitted to the political community constituted by the United States Constitution.

101. The Residence Rule violates this principle because including illegal aliens and nonimmigrant aliens in the apportionment base systematically

redistributes congressional seats and electoral votes from states with low numbers of illegal aliens and nonimmigrant aliens to states with high numbers. As a result, congressional representatives and electors of states with high numbers of illegal aliens and nonimmigrant aliens represent substantially fewer constituents than representatives and electors from states with low numbers of illegal aliens and nonimmigrant aliens.

102.    Thus, including illegal aliens and nonimmigrant aliens in the apportionment base will deprive Plaintiff States and their citizens of their rightful share of political power in both Congress and the Electoral College while unconstitutionally augmenting the political power of states with high numbers of illegal aliens and nonimmigrant aliens.

103.    Thus, the Residence Rule violates the Fourteenth Amendment because it violates the principle of equal representation enshrined in that amendment.

104.    For the same reason, the Residence Rule violates Article II, § 1, of the Constitution because it mandates a distribution of Electoral College votes based on an allocation of congressional seats that violates the principle of equal representation.

## CLAIMS FOR RELIEF

## COUNT I

## Violation of the Fourteenth Amendment (Congressional Apportionment)

105.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

106.     As this Court and others have held, "reviewing [a presidential order] as to whether it was *ultra vires* is appropriate to determine whether the President has violated the Constitution, the statute under which the challenged action was taken violated the Constitution or conflicted with other statutes, or whether there was no statutory authority to take a particular action." *Louisiana v. Biden*, 622 F. Supp. 3d 267, 288 (W.D. La. 2022); *accord Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002); *Associated Builders & Contractors of Se. Tex. v. Rung*, 2016 WL 8188655, at *5 (E.D. Tex. Oct. 24, 2016); *Ancient Coin Collectors Guild v. U.S. Customs & Border Protection*, 801 F. Supp. 2d 383, 406 (D. Md. 2011). In addition, this case falls "[u]nder the *Larson* doctrine" because it asserts both that "a federal official acted *ultra vires* of statutorily delegated authority" and that "the officer acted in an unconstitutional manner or pursuant to an unconstitutional grant of authority." *See, e.g.*, *Texas v. Biden*, 2021 WL 4552547, at *4–5 (N.D. Tex. July 19, 2021); *see also Free Enter. Fund v. PCAOB*, 561 U.S. 477, 491 n.2 (2010) (recognizing "an implied private right of action directly under the Constitution to challenge governmental action under ... separation-of-powers principles"); *Collins v. Yellen*, 594 U.S. 220, 245 (2021) ("[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge.").

107.     Section 2 of the Fourteenth Amendment provides that "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding

Indians not taxed." U.S. Const., amend. XIV. And such apportionment shall exclude any "inhabitants" who are denied the right to vote. *Id*.

108.    The Residence Rule caused the apportionment based on the 2020 census to violate the Fourteenth Amendment by including aliens who should not be counted for the purpose of apportionment, and by effectuating an interstate apportionment that is inconsistent with the constitutional principle of equal representation. And it will similarly violate the Fourteenth Amendment when the census is held again in 2030. Thus, the Residence Rule violates the Fourteenth Amendment, is unconstitutional and must be set aside.

## COUNT II

## Violation of the Fourteenth Amendment, Article I, § 2, and Article II, § 1
## (Electoral College Apportionment)

109.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

110.    Article II, § 1, provides that "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress." U.S. Const. art II, § 1, cl. 2.

111.    The Residence Rule includes illegal aliens and nonimmigrant aliens in the tally of the population of the states that is used to apportion the House of Representatives. And the number of House seats a state has determines the number of electoral votes to which a state is entitled. By including illegal aliens and nonimmigrant aliens in the population count that determines the apportionment of

electoral votes, the Residence Rule violates Article II, § 1, is unconstitutional and must be set aside.

## COUNT III

### Violation of Article I, § 2 (Actual Enumeration)

112.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

113.     Article I, § 2 provides that "[t]he actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such manner as they by law direct." U.S. const., art. I, § 2, cl. 3. The required "actual Enumeration" must be an enumeration of "the whole number of persons in each State, excluding Indians not taxed." *Id.*, amend. XIV.

114.     Illegal aliens and nonimmigrant aliens should not be counted for purposes of the Census Clause. Their inclusion in the apportionment base violates the principle of equal representation. Therefore, an "actual Enumeration" which incorporates them into the count of the number of persons in each state is constitutionally defective. In doing so, the Residence Rule violates Article I, § 2's requirement of an "actual enumeration" of the number of persons in each state. It must be set aside as unconstitutional.

### PRAYER FOR RELIEF

115.     Wherefore, Plaintiffs ask this Court to issue an order and judgment:

a. Declaring that the Residence Rule is unlawful because it violates (1) Section 2 of the Fourteenth Amendment, (2) the Census Clause of Article I, § 2, (3) the Electoral Apportionment Clause of Article II, § 1;

b. Declaring that any apportionment of the House of Representatives conducted pursuant to 2 U.S.C. § 2a by the Secretary of Commerce that does not use the best available methods to exclude illegal aliens and nonimmigrant aliens from the apportionment base used to apportion congressional seats and Electoral College votes among the states would be unconstitutional.

c. Vacating and setting aside the Residence Rule insofar as it permits or requires the Census Bureau to include illegal aliens and nonimmigrant aliens in the apportionment base used to apportion congressional seats and Electoral College votes among the states;

d. Enjoining the Department of Commerce and the Census Bureau to include the following questions, with respect to each person in a household, on the 2030 and subsequent Censuses:

1. Is this person a United States Citizen?

2. If this person is not a United States Citizen, is this person a lawful permanent resident of the United States?

e. Remanding this case to the Department of Commerce and the Census Bureau to permit Defendants to issue rules that comply with the Constitution.

f. Awarding Plaintiffs such additional relief, including injunctive relief, as the Court deems appropriate.

Dated: January 17, 2025                  Respectfully submitted,

**ELIZABETH B. MURRILL**
**Attorney General of Louisiana**

 /s/ Tracy Short
Tracy Short (La #23940)
*Assistant Chief Deputy Attorney*
  *General*
Office of the Louisiana Attorney
General
1885 North Third Street
Baton Rouge, LA 70802
Phone : (225) 326-6705
shortt@ag.louisiana.gov

**KRIS W. KOBACH**
**Attorney General of Kansas**

*/s/ James R. Rodriguez*
James R. Rodriguez*
*Assistant Attorney General*
Kansas Office of the Attorney General
Topeka, Kansas 66612-1597
Phone: (785) 260-3960
jay.rodriguez@ag.ks.gov

Christopher J. Hajec*
D.C. Bar No. 492551
Matt A. Crapo*
D.C. Bar No. 473355
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, DC 20001
Phone: (202) 232-5590
Fax: (202) 464-3590
chajec@irli.org
mcrapo@irl.org

*Counsel for the State of Kansas*

**DAVE YOST**
**Ohio Attorney General**

*/s/ T. Elliot Gaiser*
T. Elliot Gaiser*
*Solicitor General*
30 East Broad Street, 17th Floor
Columbus, OH 43215
Phone: (614) 466-8980
thomas.gaiser@ohioago.gov

*Counsel for State of Ohio*

**JOHN B. MCCUSKEY**
**Attorney General of West Virginia**

*/s/ Michael R. Williams*
Michael R. Williams*
*Solicitor General*
State Capitol Complex,
Bldg. 1, Rm E-26
1900 Kanawha Blvd. E
Charleston, WV 25305
Phone: (304) 558-2021
michael.r.williams@wvago.gov

*Counsel for State of West Virginia*

*\*Pro Hac Vice forthcoming*