IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| **THE STATE OF LOUISIANA**, By and through its Attorney General, Elizabeth B. Murrill;<br>**THE STATE OF KANSAS**, By and through its Attorney General, Kris W. Kobach;<br>**THE STATE OF OHIO**, By and through its Attorney General, Dave Yost; and<br>**THE STATE OF WEST VIRGINIA**, By and through its Attorney General, John B. McCuskey,<br><br>        *Plaintiffs*,<br><br>    v.<br><br>**UNITED STATES DEPARTMENT OF COMMERCE**;<br>**JEREMY PELTER**, in his official capacity as Acting Secretary of Commerce;[†]<br>**BUREAU OF THE CENSUS**, an agency within the United States Department of Commerce; and<br>**ROBERT L. SANTOS**, in his official capacity as Director of the U.S. Census Bureau,<br><br>        *Defendants*. | **Case No. 6:25-cv-00076-DCJ-DJA**<br><br>Judge:              Hon. David C. Joseph<br>Magistrate Judge:   Hon. David J. Ayo<br><br><br>**MEMORANDUM IN SUPPORT OF COUNTY OF SANTA CLARA'S MOTION TO INTERVENE** |

---

[†] Pursuant to Federal Rule of Civil Procedure 25(d), Jeremy Pelter is automatically substituted for his predecessor.

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS.................................................................................................... ii

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ............................................................................................................1

BACKGROUND ..............................................................................................................3

APPLICANT FOR INTERVENTION .............................................................................5

ARGUMENT ....................................................................................................................6

1.  The County Is Entitled to Intervene as of Right Under Rule 24(a)(2)...............6

   A.  The County's Motion to Intervene Is Timely. ........................................... 6

   B.  The County Has Substantial Interests Related to the Subject of the Action................ 8

      i.   Federal Funding ................................................................................ 9

      ii.  Integrity of Accurate Internal Boundaries .......................................... 11

   C.  A Decision in this Suit May Impede or Impair the County's
      Ability to Protect Its Interests. ...................................................... 12

   D.  The County's Interests Are Not Adequately Represented
      by the Existing Parties to this Suit. .................................................. 13

2.  Alternatively, the Country Should Be Granted Permissive Intervention Under Federal
   Rule of Civil Procedure 24(b)...........................................................................15

CONCLUSION................................................................................................................17

## TABLE OF AUTHORITIES

Page

**Cases**

*Alabama v. United States Dep't of Commerce*,
  No. 2:18-CV-772-RDP, 2018 WL 6570879 (N.D. Ala. Dec. 13, 2018) ............................ 9, 15

*Carey v. Klutznick*,
  637 F.2d 834 (2d Cir. 1980) (per curiam) ................................................................. 10

*City of Detroit v. Franklin*,
  4 F.3d 1367 (6th Cir. 1993) ...................................................................................... 9

*City of New York v. U.S. Dep't of Commerce*,
  713 F. Supp. 48 (E.D.N.Y. 1989) ............................................................................. 9

*City of Willacoochee, Ga. v. Baldrige*,
  556 F. Supp. 551 (S.D. Ga. 1983) ........................................................................... 10

*Dep't of Commerce v. New York*,
  588 U.S. 752 (2019) ............................................................................................ 9, 12

*Dep't of Commerce v. U.S. House of Representatives*,
  525 U.S. 316 (1999) ................................................................................................ 11

*Entergy Gulf States Louisiana, L.L.C. v. EPA*,
  817 F.3d 198 (5th Cir. 2016) ........................................................................... 6, 13, 15

*Evenwel v. Abbott*,
  578 U.S. 54 (2016) ............................................................................................. 12, 16

*Fed. for Am. Immigration Reform (FAIR) v. Klutznick*,
  486 F. Supp. 564 (D.D.C. 1980) .............................................................................. 12

*Field v. Anadarko Petroleum Corp.*,
  35 F.4th 1013 (5th Cir. 2022) ................................................................................. 3, 7

*Ford v. City of Huntsville*,
  242 F.3d 235 (5th Cir. 2001) .................................................................................... 7

*Harris v. Pernsley*,
  820 F.2d 592 (3d Cir. 1987) .................................................................................... 10

*Hines v. D'Artois*,
  531 F.2d 726 (5th Cir. 1976) .................................................................................. 10

*La Union del Pueblo Entero v. Abbott*,
  29 F.4th 299 (5th Cir. 2022) ............................................................................. passim

*Newby v. Enron Corp.*,
  443 F.3d 416 (5th Cir. 2006) .................................................................................... 8

*Nuesse v. Camp*,
  385 F.2d 694 (D.C. Cir. 1967) ................................................................................ 10

iii

*Ross v. Marshall,*
   426 F.3d 745 (5th Cir. 2005) ...................................................................... 7

*Rotstain v. Mendez,*
   986 F.3d 931 (5th Cir. 2021) ................................................................ 7, 15

*Texas v. United States,*
   805 F.3d 653 (5th Cir. 2015) ...................................................................... 6

*United States ex rel. Hernandez v. Team Fin., L.L.C.,*
   80 F.4th 571 (5th Cir. 2023) ...................................................................... 8

*Utah v. Evans,*
   536 U.S. 452 (2002).................................................................................. 11

*Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n,*
   834 F.3d 562 (5th Cir. 2016) ............................................................... 8, 10

**Constitutional Provisions**

U.S. Const. amend. XIV § 2, cl. 1 ................................................................. 1

U.S. Const. art. I, § 2, cl. 3............................................................................. 1

**Statutes**

Cal. Elec. Code § 21130 .............................................................................. 12

Cal. Elec. Code § 21500 .............................................................................. 12

Cal. Welf. & Inst. Code § 10800 ................................................................... 6

Cal. Welf. & Inst. Code § 16500 ................................................................... 6

Cal. Welf. & Inst. Code § 17000 ............................................................. 6, 11

**Other Authorities**

Bureau of the Census, *2020 Decennial Census Residence Rule and Residence Situations,*
   80 Fed. Reg. 28,950 (proposed May 20, 2015) ........................................ 4

Bureau of the Census, *Final 2020 Census Residence Criteria and Residence Situations,*
   83 Fed. Reg. 5,525 (Feb. 8, 2018) ........................................................ 3, 4

Exec. Order No. 13,986 of January 20, 2021, 86 Fed. Reg. 7,015 (Jan. 25, 2021)
   (Ensuring a Lawful and Accurate Enumeration and Apportionment Pursuant to the Decennial
   Census)................................................................................................... 14

Exec. Order No. 14,148 of January 20, 2025, 90 Fed. Reg. 8,327 (Jan. 28, 2025)
   (Initial Rescissions of Harmful Executive Orders and Actions)............... 14

Memorandum of July 21, 2020, 85 Fed. Reg. 44,679 (Jul. 23, 2020)
   (Excluding Illegal Aliens from the Apportionment Base Following the 2020 Census)........... 14

**Court Rules**

Fed. R. Civ. P. 12 ........................................................................................................ 16

Fed. R. Civ. P. 24 ..................................................................................................... 6, 16

Memorandum in Support of                                        Case No. 6:25-cv-00076-DCJ-DJA
County of Santa Clara's Motion to Intervene

## INTRODUCTION

Four Plaintiff states ask this Court to hold that the settled and consistent method that the federal government has used for at least three quarters of a century to conduct the decennial nationwide census—the constitutionally mandated "actual Enumeration" of the "whole number of persons" living in each state of the United States, U.S. Const. art. I, § 2, cl. 3—violates three different provisions of the Constitution. Plaintiffs contend, primarily, that the constitutional phrase "whole number of persons in each State," U.S. Const. amend. XIV § 2, cl. 1, excludes two categories of persons based on the statuses assigned to them under the Immigration and Nationality Act of 1952: noncitizens who lack proper legal documentation ("undocumented persons") and other noncitizens who hold temporary visas and are not lawful permanent residents ("non-LPRs").[1]

If Plaintiffs were to succeed in this case, the outcome would severely and irreparably injure the substantial interests of Applicant the County of Santa Clara ("County"). The County's interests differ from the interests of Defendants in this action—federal offices and federal officers sued in their official capacities. As such, Defendants in this matter will not adequately protect the County's interests, and the County has a right to intervene.

This action deeply implicates the County's interests because the County will suffer significant financial and operational harm if undocumented persons and non-LPRs are not included in the 2030 Decennial Census (the "2030 Census"). Santa Clara County is home to a disproportionately large population of undocumented persons and non-LPRs. The County provides critical safety-net services—including child-welfare, housing, and public-health

---

[1] The County uses the term "undocumented persons" to denote the same individuals that Plaintiffs characterize as "illegal aliens" and the term "non-LPRs" to denote the same individuals that Plaintiffs describe as "nonimmigrant aliens." *See* Compl. [ECF No. 1] at 2 & n.2.

services—to its residents, including undocumented persons and non-LPRs.  If Plaintiffs succeed

in this action, the County would lose a significant portion of the more than $400 million in

Census-Based Federal Funding that the County uses to provide these safety-net services.[2]  As

Plaintiffs point out, some of the funding streams at issue are based on relative populations, such

that Plaintiffs' alleged gains from a Census count that excludes undocumented persons and non-

LPRs would be the County's loss.  The relief that Plaintiffs seek will also have a profound

impact on the County's ability to satisfy its legal duty to maintain accurate internal political

boundaries.  By statute, the County draws its own political districts by reference to census data;

using the Census count Plaintiffs seek will render these political boundaries inaccurate.

        The County's interests will go unrepresented in this action if the County is not allowed to

intervene.  Defendants—the Department of Commerce, the Census Bureau, and their top

officials—have no stake in the relative distribution among states and localities of federal funding

for safety-net services or, therefore, the amount of such funding the County receives; nor do

Defendants have any stake in the state and local decisions about the distribution of political

representation that result from the Census count.  Even more, the federal government has

indicated support for Plaintiffs' theory that undocumented persons and non-LPRs should be

excluded from the Census.  Even if Defendants commence a defense to this suit, there is no

guarantee—and, indeed, a substantial reason to doubt—that they will defend vigorously the

position that undocumented persons and non-LPRs must be counted.  Simply asserting a defense

is not enough to defeat the County's entitlement to intervene: Defendants must assert a defense

---

[2] The term "Census-Based Federal Funding" refers to funding identified in a Census Bureau
publication entitled "Uses of Decennial Census Programs Data in Federal Funds Distribution:
Fiscal Year 2021," which is cited and discussed in Part 1.B.i below.

that adequately protects the County's interests. Therefore, the County seeks to intervene to oppose Plaintiffs' erroneous legal interpretations and the improper relief they seek.

The County meets the requirements for intervention as of right under Rule 24(a): (1) its motion is timely, (2) it has an interest relating to the property or transaction that is the subject of the litigation, (3) it is situated such that the disposition of the action may, as a practical matter, impair or impede its ability to protect that interest if intervention is not allowed, and (4) its interests are inadequately represented by the existing parties to the suit. *See La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 304-05 (5th Cir. 2022); *Field v. Anadarko Petroleum Corp.*, 35 F.4th 1013, 1017 (5th Cir. 2022). If, however, the Court deems the County ineligible to intervene as of right, the County should be granted permissive intervention under Rule 24(b).

## BACKGROUND

To conduct an enumeration of the whole number of persons residing in the United States as required by the Constitution, the Census Bureau (the "Bureau"), a component of the Department of Commerce, promulgated criteria for how to count people for the purposes of the 2020 decennial census. *See* Bureau of the Census, *Final 2020 Census Residence Criteria and Residence Situations*, 83 Fed. Reg. 5,525 (Feb. 8, 2018) ("Residence Rule"). The Residence Rule, which was promulgated in February 2018 following two rounds of notice and comment beginning in 2015, provides:

> The Residence Criteria are used to determine where people are counted during the 2020 Census . . . . The following sections describe how the Residence Criteria apply to certain living situations for which people commonly request clarification . . . . 3. *Foreign Citizens in the United States* (a) *Citizens of foreign countries living in the United States*—Counted at the U.S. residence where they live and sleep most of the time.

*Id.* at 5,533. There is no provision for adjusting the count based on immigration status. Pursuant to the Residence Rule and consistent with longstanding practice and Supreme Court precedent,

the 2020 Census's enumeration of the whole number of persons residing in the United States included undocumented persons and non-LPRs.

The current Residence Rule reflects the Bureau's longstanding and consistent practice of counting foreign citizens as part of the Census *regardless* of their immigration status.  *See*, *e.g.*, Bureau of the Census, *2020 Decennial Census Residence Rule and Residence Situations*, 80 Fed. Reg. 28,950, 28,950-01 (proposed May 20, 2015) ("The Residence Rule was used to determine where people should be counted during the 2010 Census" and provided "'(a) Citizens of foreign countries living in the U.S.—Counted at the U.S. residence where they live and sleep most of the time.'"); Declaration of Rachel A. Neil ("Neil Decl.") Ex. A, at 5 ("United States Census Bureau, Residence Rules: Facts About Census 2000 Residence Rules," which states that "Citizens of foreign countries who have established a household or are part of an established household in the U.S. while working or studying, including family members with them - Counted at the household.").  Indeed, as the Residence Rule notes, "[t]his concept of 'usual residence' is grounded in the law providing for the first census, the Act of March 1, 1790, expressly specifying that persons be enumerated at their 'usual place of abode.'"  Residence Rule, 83 Fed. Reg. at 5,526.

Plaintiffs filed suit on January 17, 2025, bringing constitutional challenges to the Residence Rule based on its inclusion of undocumented persons and non-LPRs in the Census count.  Plaintiffs allege that they will be injured because including undocumented persons and non-LPRs in the 2030 Census will result in: (1) Plaintiffs' loss of federal funding as a result of having undocumented and non-LPR populations that are smaller than the corresponding populations in certain other states; and (2) Plaintiffs' potential loss of congressional seats and

electoral votes in the subsequent reapportionment, whereas states with high undocumented and non-LPR populations stand to gain.  Compl. ¶¶50-68.

Plaintiffs seek, among other relief, a declaration that the Residence Rule is unconstitutional, a declaration that failure to exclude undocumented persons and non-LPRs in the subsequent apportionment of congressional seats and Electoral College votes among the states would be unconstitutional, and an injunction ordering the federal Defendants to include questions regarding citizenship and lawful permanent residency status in the 2030 and subsequent Censuses.  *Id.* at 31.

Defendants only appeared in this matter one day before the County filed the instant motion.  *See* ECF No. 29.  One set of individuals—two California and three Texas voters ("Proposed Voter Intervenors")—filed a motion for leave to intervene on January 27, 2025.  ECF No. 3.  The parties have yet to respond to that motion or take any other substantial actions. Defendants' response to the Complaint is not due until April 7, 2025.

## APPLICANT FOR INTERVENTION

The County of Santa Clara has a total population of approximately 1.88 million residents. Declaration of Greta S. Hansen ("Hansen Decl.") ¶ 6.  It has been estimated that the County is among the top twenty counties with the largest populations of undocumented persons in the nation, that undocumented persons compose approximately 7 percent of the County's population, and that California—and Santa Clara County in particular—account for a disproportionately large percentage of non-LPRs in the United States with approved H-1B visas, which are available for highly skilled professionals working in specialty occupations.  *See id.* ¶¶ 6-8.

In Fiscal Year 2023, the County of Santa Clara received over $410 million of federal funding from a variety of Census-Based Federal Funding streams that are based on census

population data for the County and California as a whole. *Id.* ¶ 9 & Ex. A. These funds were used, in many cases, to provide for essential services, like child welfare and core social safety-net services. *Id.* ¶¶ 9-14 & Ex. A. For example, the County of Santa Clara receives Social Services Block Grants, Foster Care funding streams, and Maternal and Child Health Grants. *Id.* ¶¶ 11, 14 & Ex. A.

The County is the designated safety-net service provider for Santa Clara County under state law. Accordingly, if the federal government fails to provide funding for fundamental needs like child welfare, public health, and healthcare, the responsibility for filling the funding gap will, in many cases, ultimately fall to the County. *See, e.g.*, Cal. Welf. & Inst. Code §§ 17000, 10800, 16500; Hansen Decl. ¶¶ 13-14.

## ARGUMENT

**1.    The County Is Entitled to Intervene as of Right Under Rule 24(a)(2).**

As detailed below, the County meets each of the four requirements for intervention under Rule 24(a)(2) and is therefore entitled to intervene as of right. *See* Fed. R. Civ. P. 24(a) (a "court must permit anyone to intervene who" satisfies the requirements of Rule 24(a)). This is especially so in light of the established rule that Rule 24(a)'s requirements must "be liberally construed," with "doubts resolved in favor of the proposed intervenor." *Entergy Gulf States Louisiana, L.L.C. v. EPA*, 817 F.3d 198, 203 (5th Cir. 2016); *accord La Union del Pueblo Entero*, 29 F.4th at 305; *Texas v. United States*, 805 F.3d 653, 656-57 (5th Cir. 2015).

**A.    The County's Motion to Intervene Is Timely.**

Courts within the Fifth Circuit typically consider four factors when evaluating the timeliness of a motion to intervene, namely "the length of time the movant waited to file, the prejudice to the existing parties from any delay, the prejudice to the movant if intervention is

denied, and any unusual circumstances." *Rotstain v. Mendez*, 986 F.3d 931, 937 (5th Cir. 2021) (citing *Stallworth v. Monsanto Co.*, 558 F.2d 257, 264-66 (5th Cir. 1977)).  Each of these factors supports a finding that the County's motion to intervene is timely.

First, the short amount of time between when the County learned that it had an interest in this case and when it filed the motion to intervene supports the timeliness of the application.  *See id.*  "Generally, filing a motion to intervene as soon as an intervenor realizes its interests are not adequately protected is sufficient to meet the timeliness requirement." *Field*, 35 F.4th at 1018. The County expeditiously prepared and filed this motion to intervene, submitting it less than one month after Plaintiffs filed suit.

Second, given the extremely early stage of proceedings, there can be no serious argument that any party has suffered prejudice because the County did not file its motion to intervene any earlier than it did.  *See, e.g.*, *Ross v. Marshall*, 426 F.3d 745, 755 (5th Cir. 2005) (explaining that "to show prejudice, [a party opposing intervention] must point to results that would not have obtained but-for [the applicant's] failure to file its motion to intervene *earlier*," and holding that opposing party's frustration with intervenor's motions and appeals does not demonstrate prejudice because they did not arise because of the applicant's delay in seeking intervention) (emphasis in original); *Ford v. City of Huntsville*, 242 F.3d 235, 240 (5th Cir. 2001) (similar).

The parties will not suffer prejudice based on the timing of the County's motion to intervene.  Plaintiffs' Complaint was filed on January 17, 2025.  Counsel for Defendants did not even appear in the action until one day before the County filed the instant motion.  Defendants have not yet filed a responsive pleading or motion under Rule 12, which is not due until April 7, 2025, and no party has yet responded to the Proposed Voter Intervenors' January 27, 2025 motion to intervene.  Likewise, no other legally significant proceedings have occurred in this

case.  Accordingly, the timing of the County's intervention will not delay proceedings or otherwise prejudice the existing parties.  *Compare Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, 834 F.3d 562, 565-66 (5th Cir. 2016) (finding a motion to intervene timely even though discovery had opened because the intervenor "did not seek to delay or reconsider phases of the litigation that had already concluded").

Third, as explained in greater detail in Part 1.C below, the prejudice to the County will be significant if intervention is denied.  And finally, the County is unaware of any "unusual circumstances" that could even arguably undermine the timeliness of the County's motion to intervene.  To the contrary, Plaintiffs seek an order that would affect a census not due to be conducted until five years in the future.

### B.    The County Has Substantial Interests Related to the Subject of the Action.

The County has a "'direct, substantial, legally protectable interest in the proceedings'" sufficient to support intervention by right in this matter.  *La Union del Pueblo Entero*, 29 F.4th at 305 (quoting *Edwards v. City of Houston*, 78 F.3d 983, 995 (5th Cir. 1996) (en banc)).  An intervenor's "'interest is sufficient if it is of the type that the law deems worthy of protection, even if the intervenor does not have an enforceable legal entitlement or would not have standing to pursue [its] own claim.'"  *Id.* (quoting *Texas v. United States*, 805 F.3d at 659).[3]  The existence of the County's interests in these proceedings is underscored in that this is not the first time that the County has sought to intervene in a lawsuit to defend the Residence Rule against

---

[3] A party that seeks to intervene in a pending case typically need not establish standing; however, in the absence of a live case and controversy between the plaintiffs and defendants the intervenor would need to independently establish standing.  *See Newby v. Enron Corp.*, 443 F.3d 416, 422 (5th Cir. 2006); *see also United States ex rel. Hernandez v. Team Fin., L.L.C.*, 80 F.4th 571, 576 (5th Cir. 2023).  Should the County need to establish standing in the future, it will be able to do so for the same reasons that it has substantial interests in these proceedings.

constitutional attack for the purpose of protecting and vindicating the County's own financial and operational interests.  The County previously sought and obtained permission to intervene in a lawsuit where the State of Alabama challenged the Residence Rule on grounds similar to those Plaintiffs assert in this action.  *See Alabama v. United States Dep't of Commerce*, No. 2:18-CV-772-RDP, 2018 WL 6570879, at *2 (N.D. Ala. Dec. 13, 2018) (allowing intervention by a group of voters and a set of three local governments led by the County).

    *i.*  *Federal Funding*

  Plaintiffs seek to force changes to longstanding census methodologies to exclude undocumented persons and non-LPRs from the "actual Enumeration" to be conducted in the 2030 Census and the resulting apportionment of seats in the House of Representatives among the several states.  Plaintiffs contend that this longstanding practice results in Plaintiffs losing federal funding that instead goes to other jurisdictions with higher proportions of such persons.  Compl. ¶¶ 64-68.  The County is just such a jurisdiction: it serves a region that is home to many foreign-born residents, including undocumented persons and non-LPRs.  As a result, it has a direct, substantial, and legally protectable interest in ensuring a Census count that includes those persons in order to maintain an appropriate level of Census-Based Federal Funding to provide critical services.

  The loss of federal funding is an archetypal legally protectable interest, which has been consistently recognized in the standing context and which establishes a legally cognizable interest here.  *See Dep't of Commerce v. New York*, 588 U.S. 752, 767 (2019); *City of Detroit v. Franklin*, 4 F.3d 1367, 1374 (6th Cir. 1993) (city had standing to challenge Census Bureau actions based on claim that undercount would result in the loss of federal funds); *City of New York v. U.S. Dep't of Commerce*, 713 F. Supp. 48, 50 (E.D.N.Y. 1989) (municipal plaintiffs'

allegation of loss of federal funds satisfied the standing requirement); *City of Willacoochee, Ga. v. Baldrige*, 556 F. Supp. 551, 553-55 (S.D. Ga. 1983) (city had standing to challenge Census Bureau population count because the loss of funds resulting from an undercount constituted a distinct and palpable injury); *Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir. 1980) (per curiam) (city and state established standing by claiming a decrease in federal funds and vote dilution); *see also Wal-Mart Stores, Inc.*, 834 F.3d at 566 n.3 (movant who has standing also deemed to have a sufficient interest to support intervention).  Moreover, if a public official's "rights and duties . . . may be affected directly by the disposition of [a case], [a public official] has a sufficient interest to intervene as of right in the action."  *Harris v. Pernsley*, 820 F.2d 592, 597 (3d Cir. 1987) (citing *Blake v. Pallan*, 554 F.2d 947, 953 (9th Cir. 1977)); *Hines v. D'Artois*, 531 F.2d 726, 738 (5th Cir. 1976); *Nuesse v. Camp*, 385 F.2d 694, 700 (D.C. Cir. 1967).  The County's duty and ability to provide safety-net services, and to administer them using Census-Based Federal Funding, will be affected by the disposition of this litigation, which establishes another legally cognizable interest in the litigation.

Plaintiffs acknowledge—and the Census Bureau has stated—that many federal programs utilize census figures to allocate funds to state or local governments.  Compl. ¶¶ 64-68; *see* Neil Decl. Ex. D (Census Bureau, *Uses of Decennial Census Programs Data in Federal Funds Distribution: Fiscal Year 2021* (June 2023)).  Indeed, the Census Bureau estimated that, in Fiscal Year 2021, $2.8 trillion in federal assistance was distributed using census data via programs such as the Medical Assistance Program, the Supplemental Nutrition Assistance Program ("SNAP"), Medicare Part B, Temporary Assistance for Needy Families ("TANF"), and Section 8 Housing Choice Vouchers.  Neil Decl. Ex. D, at 2.

The County would be hard-hit by the change to Census-Based Federal Funding distribution that would result from not counting undocumented persons and non-LPRs.  The County receives over $410 million in such funding annually, which it uses to fund critical programs.  Hansen Decl. ¶¶ 7–8.  For example, in FY23 the County received more than $190 million for Medicare, more than $3 million in funding for senior nutrition, and more than $100 million in TANF funds.  *Id.* ¶¶ 10.  It also receives significant funding through Social Services Block Grants, Foster Care funding streams, and Maternal and Child Health Grants.  The impact on the County of curtailed federal funding would likely be acute because of its disproportionately large population of undocumented persons and non-LPRs and also because, in many cases, the County would be required to fill any funding gaps to meet its statutory obligation to provide essential safety-net services to all indigent county residents.  *See, e.g.,* Cal. Welf. & Inst. Code § 17000; Hansen Decl. ¶¶ 10–11.  Plaintiffs' proposed exclusion of undocumented persons and non-LPRs from the 2030 Census count therefore directly threatens the allocation of federal resources to the County.

  ii.  *Integrity of Accurate Internal Boundaries*

The County must maintain accurate internal political boundaries.  It therefore has a substantial interest in ensuring that the political apportionment that follows the Census count continues to include undocumented persons and non-LPRs.  *See Utah v. Evans*, 536 U.S. 452, 478 (2002) (noting certain elements of the Constitution "suggest a strong constitutional interest in [the] accuracy" of the Census count); *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 333 (1999) (holding state residents had standing to sue where "[s]everal of the States in which the counties [we]re located require[d] use of federal decennial census population numbers for their state legislative redistricting").

The County is required by statute to set its internal political boundaries by reference to the Census. Cal. Elec. Code §§ 21130(a), 21500 (requiring Board of Supervisors to "adopt boundaries for all of the supervisorial districts of the county" "so that the election districts shall be substantially equal in population" based on data from "the most recent federal decennial census for which the redistricting data . . . are available"); Hansen Decl. ¶ 15. If Plaintiffs' position prevails in this action, it will fundamentally distort the County's political districts. *See Dep't of Commerce v. New York*, 588 U.S. at 767-68 (concluding that suppression of responses from noncitizen households was the "predictable effect" of addition of a citizenship question to the Census).[4]

## C.    A Decision in this Suit May Impede or Impair the County's Ability to Protect Its Interests.

The County easily makes the required showing that an adverse disposition of this action would "impair or impede" the County's ability to protect its interests. *La Union del Pueblo Entero*, 29 F.4th at 306-07. To support intervention as of right, this impairment "must be 'practical' and not merely 'theoretical,'" but it need not be guaranteed: the County need only show that "there is a *possibility* that their interest could be impaired or impeded." *Id.* at 307 (emphasis added). This standard is satisfied here.

---

[4] In addition, such an outcome may implicate the County's interest in ensuring that it receives proportional representation based on a proper "actual Enumeration" of "persons" via the decennial census. It is long-settled that all persons residing in the United States—documented and undocumented alike—must be counted to fulfill the "actual Enumeration" mandate in Article I, Section 2 of the U.S. Constitution that undergirds the decennial census. *Fed. for Am. Immigration Reform (FAIR) v. Klutznick*, 486 F. Supp. 564, 566-67 (D.D.C. 1980); *see also Evenwel v. Abbott*, 578 U.S. 54, 73-74 (2016) (rejecting constitutional challenge to inclusion of undocumented persons in redistricting, and noting that it is reasonable for districts to include nonvoters because, "[a]s the Framers of the Constitution and the Fourteenth Amendment comprehended, representatives serve all residents, not just those eligible or registered to vote" since "[n]onvoters have an important stake in . . . receiving constituent services, such as help navigating public-benefits bureaucracies.").

Plaintiffs themselves contend that the outcome in this matter will profoundly affect the interests of the County and similarly situated jurisdictions.  Indeed, redistribution of federal funds away from jurisdictions "whose populations contain a higher percentage of illegal and nonimmigrant aliens" is an express purpose of Plaintiffs' suit.  Compl. ¶¶ 68, 95.  Plaintiffs repeatedly and specifically identify California—home to the County of Santa Clara—as such a jurisdiction.  *Id*. ¶¶ 39, 62, 66, 68.  But even apart from Plaintiffs' contentions, it is plain that if Plaintiffs prevail in forcing the government to conduct a Census that produces population data that excludes undocumented persons and non-LPRs, the County will lose critical federal funding and the ability to draw accurate political boundaries.  *See* Hansen Decl. ¶¶ 6-15; Part 1.B above.

In short, there is no doubt that the County has direct, substantial, and legally protectable interests in the apportionment of finite, census-determined representation and federal funds, and the outcome of this case may impair the County's ability to defend those interests.

### D.    The County's Interests Are Not Adequately Represented by the Existing Parties to this Suit.

The County easily meets its "minimal" burden to show that the existing parties cannot adequately represent their interests.  *Entergy Gulf States Louisiana, L.L.C.*, 817 F.3d at 203.  The County "'need not show that the representation by existing parties will be, for certain, inadequate,' but instead that it *may* be inadequate."  *La Union del Pueblo Entero*, 29 F.4th at 307-08 (quoting *Texas*, 805 F.3d at 661).

The County has a concrete interest in how Census results will impact the distribution of federal funding among government jurisdictions and in the integrity of the County's internal boundaries.  Defendants do not share these concerns and, as a result, cannot adequately represent the County's interests. *La Union del Pueblo Entero*, 29 F.4th at 308 (existing party's representation of applicant's interests was inadequate where the applicant's "interests diverge

from the putative representative's interests in a manner germane to the case," even if they share the same ultimate objective in the case).

Further, by its statements and actions, including very recent actions, the federal government has indicated that it may not resist the relief sought by Plaintiffs in the same manner as the County. For example, in 2021 President Biden issued an executive order that asserted that the Constitution requires the census to include "all persons . . . regardless of their immigration status," and established a "policy of the United States that reapportionment shall be based on the total number of persons residing in the several States, without regard for immigration status." Exec. Order No. 13,986 of January 20, 2021, at § 2, 86 Fed. Reg. 7,015, 7,016 (Jan. 25, 2021) (entitled "Ensuring a Lawful and Accurate Enumeration and Apportionment Pursuant to the Decennial Census"). Within his first hours in office, President Trump called President Biden's executive order "harmful" and rescinded it. Exec. Order No. 14,148 of January 20, 2025, at § 2(b), 90 Fed. Reg. 8,327 (Jan. 28, 2025) (entitled "Initial Rescissions of Harmful Executive Orders and Actions") (rescinding Exec. Order No. 13,986 of January 20, 2021).

President Trump's January 20, 2025 rescission was consistent with the Memorandum he issued during his first term, which contended that the Constitution permits exclusion of undocumented persons from the census and established a policy of "exclud[ing] from the apportionment base aliens who are not in a lawful immigration status under the Immigration and Nationality Act" on the ground that doing so "is more consonant with the principles of representative democracy underpinning our system of Government." Memorandum of July 21, 2020, 85 Fed. Reg. 44,679 (Jul. 23, 2020) (entitled "Excluding Illegal Aliens from the Apportionment Base Following the 2020 Census"). These actions illustrate a stark "adversity of interest" between the County and Defendants, which underscores the inadequacy of Defendants

as a representative of the County's interests. *See Entergy Gulf States Louisiana, L.L.C.*, 817 F.3d at 204. Indeed, President Trump's Memorandum asserted a policy that is precisely the result Plaintiffs seek in this lawsuit.

Given the divergence between the County and Defendants related to the County's interest in federal funding and apportionment, and the current Presidential Administration's apparent sympathy for Plaintiffs' theory, the County has carried the minimal burden of showing that Defendants' representation of the County's interest may be inadequate.

What is more, even if the Proposed Voter Intervenors prevail in their motion, the County's interests will still not be adequately represented. The County's interests in maintaining federal funding and the integrity of its internal political boundaries are specific to its status as a local governmental entity, and therefore differ from the Proposed Voter Intervenors' interests in preserving their political representation and the effectiveness of their votes. Mot. to Intervene by Hannah Victoria Morgan et al. [ECF No. 3] at 7-8; *see La Union del Pueblo Entero*, 29 F.4th at 308. As such, even if this Court grants Proposed Voter Intervenors' leave to intervene, the County's interests will remain unrepresented unless it is also permitted to intervene. *Compare Alabama*, 2018 WL 6570879, at *2 (allowing intervention by a group of voters and also a set of three local governments led by the County).

## 2. Alternatively, the County Should Be Granted Permissive Intervention Under Federal Rule of Civil Procedure 24(b).

In addition to seeking to intervene in this action as a matter of right, the County requests that this Court, alternatively, permit the County to intervene pursuant to Rule 24(b). When sought upon timely motion, permissive intervention is appropriate where a party's claim or defense and the main action have a question of law or fact in common and the motion to intervene is timely. *Rotstain*, 986 F.3d at 942.

For the reasons stated in Part 1.A above, the County's motion is timely.  The County also easily meets the commonality standard because its primary defense to each of Plaintiffs' causes of action—which it must assert to protect its funding and apportionment interests set forth above—is that the Residence Rule is constitutional.  *See* Proposed Answer (attached). Therefore, the County seeks to intervene on not only a common but an *identical* question of law. Whereas Plaintiffs contend that the Constitution requires undocumented persons and non-LPRs be *excluded* for Census-counting purposes, Compl. ¶¶ 107-108, 111, 114, 115, the County asserts the precise opposite—that the Constitution permits, and indeed requires, *inclusion* of these persons in the Census.  *See generally Evenwel*, 578 U.S. at 64-75.  The County thus proposes to contest the relief sought by Plaintiffs as impermissible under the Constitution or federal law by asserting a defense that plainly "share[s] with the main action a common question of law" for purposes of Rule 24(b).

Moreover, intervention will neither unduly delay nor prejudice the adjudication of the original parties' rights.  Fed. R. Civ. P. 24(b)(3).  As noted in Part 1.A above, this litigation is still in its earliest stages: Plaintiffs filed their Complaint on January 17, 2025, and Defendants only appeared in this action the day before the County filed the instant motion, and have not yet filed a responsive pleading or motion with respect to the Complaint.  Indeed, Plaintiffs did not even serve the summons and complaint on Defendants until almost three weeks after the Court issued the summons, and Defendants have until April 7, 2025 to respond.  *See* ECF Nos. 2, 21-28; Fed. R. Civ. P. 12(a)(3).  The parties have not yet responded to the Proposed Voter Intervenors' January 27, 2025 motion to intervene, which is not scheduled to be fully briefed until February 24.  *See* ECF No. 4.  And the Proposed Voter Intervenors do not oppose the County's intervention.  As such, only the County would face prejudice from the Court denying

Memorandum in Support of
County of Santa Clara's Motion to Intervene

Case No. 6:25-cv-00076-DCJ-DJA

its intervention and participation in the action.  The County should therefore be permitted to intervene under Rule 24(b).

## CONCLUSION

For the foregoing reasons, the County respectfully requests entry of an Order permitting it to intervene as of right, under Rule 24(a), or in the alternative, granting it permissive intervention under Rule 24(b).


Dated: February 14, 2025                    Respectfully submitted,


                                            TONY LOPRESTI*
                                            COUNTY COUNSEL
                                            MEREDITH A. JOHNSON*
                                            RAPHAEL N. RAJENDRA*
                                            RACHEL A. NEIL*
                                            Office of the County Counsel
                                            County of Santa Clara
                                            70 West Hedding Street
                                            East Wing, 9th Floor
                                            San José, CA 95110
                                            Telephone: (408) 299-5900
                                            Email:    Tony.LoPresti@cco.sccgov.org
                                                      Meredith.Johnson@cco.sccgov.org
                                                      Raphael.Rajendra@cco.sccgov.org
                                                      Rachel.Neil@cco.sccgov.org

                                            JONATHAN WEISSGLASS*
                                            Law Office of Jonathan Weissglass
                                            1939 Harrison Street, Suite 150-B
                                            Oakland, CA 94612
                                            Telephone: (510) 836-4200
                                            Email:    jonathan@weissglass.com


                                            WILLIAM MOST (La. Bar No. 36914)

                                            By:    _/s/ William Most_____

                                            Most & Associates

201 St. Charles Avenue
Suite 2500 #9685
New Orleans, LA 70170
Telephone: (504) 509-5023
E-mail:   williammost@gmail.com

Attorneys for Proposed Intervenor
COUNTY OF SANTA CLARA


\* *Motion forthcoming for admission* pro hac vice

3207993